**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――――

**No. 03-2420**

―――――――――――

TKC, a joint venture,

Petitioner,

versus

NATIONAL LABOR RELATIONS BOARD,

Respondent.

―――――――――――

**No. 03-2522**

―――――――――――

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

versus

TKC, a joint venture,

Respondent.

―――――――――――

On Petition for Review and Cross-application for Enforcement of an Order of the National Labor Relations Board. (5-CA-30504; 5-CA-30554).

―――――――――――

Argued:  October 26, 2004          Decided:  January 6, 2005

―――――――――――

Before WILKINSON and TRAXLER, Circuit Judges, and HAMILTON, Senior Circuit Judge.

_____

Enforced by unpublished per curiam opinion.

_____

**ARGUED:** Abram William VanderMeer, Jr., PENDER &  COWARD, P.C., Virginia Beach, Virginia, for TKC.  David A. Seid, Office of the General Counsel, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the Board.  **ON BRIEF:** Arthur F. Rosenfeld, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Meredith L. Jason, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the Board.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

The National Labor Relations Board ("the Board") found that TKC, a joint venture of several construction companies, was in violation of the National Labor Relations Act. Among other violations, the Board found that TKC coercively interrogated an employee about his union status and then fired him for his activities in support of that union. Because there is substantial evidence in the record to support the Board's findings, we enforce its order.

## I.

TKC was the general contractor responsible for installing the foundations of the Woodrow Wilson Bridge which spans the Potomac River between Maryland and Virginia. At the peak of the project, TKC employed approximately 150 people. One of those employees was Marcus Lumpkin, a crane operator, who was hired on January 11, 2002 after responding to an ad he saw on the Internet. Lumpkin says that when he was hired, the company recruiter told him that the job would last five or six years.

Shortly after Lumpkin started working for TKC, the International Union of Operating Engineers ("the Union") began an organizing campaign. As part of their effort, Union organizers handed out literature at the entrance to the job site. In early February, Lumpkin spoke with Union representatives and agreed to

3

occasionally pass out handbills before work.  He placed a union sticker on his hard hat and one on his car bumper.

On February 7, 2002, Lumpkin had a conversation with John Mayer, a TKC area manager, about Lumpkin's intentions to join the Union.  According to Lumpkin, Mayer asked him if he was a member of the Union.  When Lumpkin responded that he hoped to be, Mayer rudely asked -- with profanity -- why anyone would want to do such a thing.  Mayer does not recall this conversation.

One week later, on February 14, 2002, Mayer laid off Lumpkin, explaining that he was no longer needed.  TKC claims that Lumpkin was fired because the company had recently dismantled a crane, and thus had more crane operators than it needed.  However, Lumpkin testified that immediately after he was fired, Mayer again asked him if he had joined the Union.  After hearing that Lumpkin had not yet done so, Mayer apparently replied, "Well tell them to get you a job," and walked away.  Mayer denies having said this.

Lumpkin further testified that on the following day, February 15, he went to Mayer to ask about a discrepancy in his paycheck.  According to Lumpkin, Mayer asked if any of his "boys" had found Lumpkin a job yet.  When Lumpkin said no, Mayer replied, "Well, tell them to stay the hell away from my gate."  Mayer again denies these allegations.

Upset over Lumpkin's layoff, the Union distributed petitions protesting TKC's decision to fire him.  To spotlight its complaints

over TKC's labor practices, the Union organized a strike and a picket line outside the project's entrance gates on April 18, 2002. Two crane operators -- Daniel McVicker and William Cunningham -- participated in the protest and did not report to work that day. TKC issued written warnings to Cunningham and McVicker for their unexcused absences.

Following these events, the Union filed charges with the NLRB, accusing TKC of committing unfair labor practices. A two-day hearing on the issue was held before an Administrative Law Judge from April 28-29, 2003. On October 17, 2003, the Board adopted the ALJ's findings and determined that TKC had violated the National Labor Relations Act in three separate ways. First, the Board found that TKC violated § 8(a)(1) of the Act by coercively interrogating Lumpkin on February 7. Second, it found TKC to have violated § 8(a)(3) and (a)(1) of the Act by laying off Lumpkin because of his activities in support of the Union and by impermissibly implying as much to him. And finally, the Board found that the company violated § 8(a)(1) of the Act by issuing disciplinary warnings to McVicker and Cunningham for engaging in protected activity. TKC now appeals.

## II.

The Board's findings of fact are conclusive "if supported by substantial evidence on the record considered as a whole." 29

5

U.S.C § 160(e) (2000).  See also Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-88 (1951).  In short, we must decide "whether on this record it would have been possible for a reasonable jury to reach the Board's conclusions."  Allentown Mack Sales & Serv. Inc., v. NLRB, 522 U.S. 359, 366 (1998).  The same deferential standard of review applies to the Board's determinations of mixed questions of law and fact. Sam's Club v. NLRB, 173 F.3d 233, 239 (4th Cir. 1999).

Such deference is particularly appropriate when reviewing determinations of credibility.  Because "the balancing of the credibility of witnesses is at the heart of the fact-finding process, . . . it is normally not the role of reviewing courts to second-guess a fact-finder's determinations about who was the more truthful witness."  NLRB v. Transpersonnel, Inc., 349 F.3d 175, 184 (4th Cir. 2003).  Thus, "absent exceptional circumstances, the ALJ's credibility findings when adopted by the Board are to be accepted by the reviewing court."  NLRB v. Air Prods. & Chems., Inc., 717 F.2d 141, 145 (4th Cir. 1983) (internal quotation and punctuation omitted).

In this case, an ALJ heard testimony from all witnesses, and authored a thorough opinion defending his conclusions.  This opinion was subsequently adopted by the Board.  TKC, 340 N.L.R.B. 102 (2003).  As to the February 7, 2004 encounter between Lumpkin and Mayer, the ALJ found Lumpkin's "demeanor" and "detailed"

6

testimony to be more believable than Mayer's denial. For similar reasons, the ALJ credited Lumpkin's version of events on February 14, 2002, the day he was fired, finding him to be a "more credible witness than Mayer." Thus, in light of the hostile encounters between Lumpkin and Mayer and in accordance with the test outlined in Wright Line, 251 N.L.R.B. 1083 (1980), the ALJ rejected TKC's claim that it fired Lumpkin simply because the company had no work for him to do.

The ALJ also considered the claim that Lumpkin's co-workers, McVicker and Cunningham, were improperly punished after they missed work to protest Lumpkin's dismissal. The ALJ was persuaded that these two employees were in fact disciplined for engaging in protected activity. Applying, as we must, a deferential standard of review to this conclusion, we find no error in the ALJ's application of Supreme Court precedent to the facts of this case. See NLRB v. Washington Aluminum Co., 370 U.S. 9, 16-17 (1962) (governing permissible discipline of employees after a concerted work stoppage with no prior notice).

## III.

We have reviewed the record, briefs, and applicable case law on this matter, and we have had the benefit of oral argument. Our careful review persuades us that the Board's decision is based upon

7

substantial evidence and is without reversible error.  Accordingly,

the Board's October 17, 2003 order shall be

ENFORCED.
